# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| RADIANCE CAPITAL RECEIVABLES EIGHTEEN, LLC, ) ) ) Plaintiff, ) ) v. ) ) MATTHEW JEROME CONCANNON, ) ) Defendant. ) | No. 2:16-cv-04280-NKL |

**ORDER**

In this lawsuit, Plaintiff Radiance Capital seeks payment from Defendant Matthew Concannon as guarantor on Providence Farm's promissory notes payable to Premier Bank. The debt is past due and Radiance sues as the successor in interest to Premier Bank. Radiance sues Concannon for breach of the Guaranty and alternatively for quantum meruit.

To recover on a breach of guaranty in Missouri, a creditor must show that: (1) the defendant executed the guaranty; (2) the defendant unconditionally delivered the guaranty to the creditor; (3) the creditor, in reliance on the guaranty, thereafter extended credit to the debtor; and (4) there is currently due and owing some sum of money from the debtor to the creditor that the guaranty purports to cover. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. 1993) (en banc). Radiance, as successor in interest to Premier Bank, is also required to show that it has a valid assignment of the Providence Farms debt and the guaranty which it seeks to enforce against Concannon.

The Court granted Radiance summary judgment with respect to three elements of its breach of Guaranty claim—reliance by Premier Bank, ownership of the Guaranty and debt by Radiance, and the amount due and owing on the debt. The remaining elements were tried to the

Court on September 26, 2017. The key disputes at trial were: (1) Whether Concannon executed the Guaranty, (2) Whether the Guaranty was delivered to Premier Bank on Concannon's behalf, and (3) Concannon's fraud in the factum defense that would make the Guaranty void even if signed and delivered. As discussed below, Radiance has proven its claim for breach of guaranty and Concannon's fraud defense fails.[1]

## I. General Findings of Fact

José Lindner[2] was Concannon's friend, tax preparer, financial advisor, and business accountant. He helped Concannon with a real estate project involving a convenience store business, to market a software program that Concannon developed, and set up the books for Concannon's private practice. Lindner also developed and owned commercial real estate projects, including Providence Farms. Concannon paid Lindner a total of $600,000 in installments, starting in late 2007, to invest in the Providence Farms project and obtain what Concannon thought was a tax credit. Concannon also understood himself to have become a member of Providence Farms, LLC through a holding company that Concannon owned, Millennium Medical Services, LLC. The Guaranty at issue in this case lists Premier Bank as the Lender, Providence Farms as the Borrower, and Concannon as the Guarantor, and is dated January 24, 2008. The final page of the Guaranty bears a signature on a line above Concannon's printed name. The Guaranty was delivered to Premier Bank, which in reliance on the Guaranty loaned a total of $14,079,000 to Providence Farms.

Providence Farms never repaid Premier Bank any portion of the loans, or accrued

---

[1] The claims for breach of guaranty and quantum meruit are pleaded in the alternative. *See Burrus v. HBE Corp.,* 211 S.W.3d 613, 619 (Mo. App. 2006) (no cause of action for quantum meruit lies under Missouri law where there is an enforceable contract governing the rights and obligations of the parties). Because Radiance is entitled to judgment on the breach claim, the quantum meruit claim is denied.

[2] José Lindner died in 2010.

2

interest. Sometime after Providence Farms' default, Premier Bank was taken over by the Federal Deposit Insurance Corporation. The FDIC assigned the Providence Farms loan debts to CADC/RADC Venture 2011-1, LLC. CADC demanded payment from Providence Farms, and Jay Lindner (José Lindner's son) and Concannon as guarantors, but none ever made any payments. CADC then filed a collections suit in the Circuit Court of Boone County, Missouri against Providence Farms, Jay Lindner, and Concannon. On September 10, 2014, Providence Farms filed a verified stipulation in which it admitted execution, delivery, and the renewals of the notes here in dispute, and the amount then due and owing on the notes. CADC dismissed its claims against Jay Lindner a few days later.

On September 23, 2014, the Boone County Circuit Court entered a consent judgment against Providence Farms, incorporating the verified stipulation of facts. The consent judgment provided that the notes had been sold to CADC, and that Providence Farm owed CADC, its successors, and assigns $15,769,774.46 in principal and interest, with interest accruing at the per diem rate of $4,298.45 from September 1, 2014 through the date of entry of judgment, and post-judgment interest accruing at the contracted rate of 13.25% on the outstanding principal balance remaining due under the notes until such amount was paid in full. Concannon did not object to entry of the consent judgment, nor was he a party to it. CADC later dismissed its state court claims against Concannon without prejudice.

In May 2016, Radiance purchased Providence Farms' debt obligations from CADC, along with original records related to the debts. The Bill of Sale stated that CADC sold, assigned and conveyed to Radiance all rights, title, and interest in the Providence Farms loans, judgments or evidence of debt, including assignment of all loan documents.

On November 4, 2016, CADC executed and filed an Assignment of Judgment in the state

3

court case. The Assignment stated that the Judgment entered against Providence Farms was assigned to Radiance, for value received and pursuant to the loan sale agreement executed by the parties, and incorporated by reference into the Assignment. The amounts due on the Providence Farm debts, as reflected in the state court judgment, Plaintiff's Exhibit 4, have not been repaid.

The Guaranty at issue states, in relevant part, that:

- Good and value consideration was given in exchange for the Guaranty, ¶ 2;
- Guarantor provided the Guaranty to induce Lender to extend credit to and engage in other transactions with Borrower, and executed the Guaranty with the intent that Lender rely upon the Guaranty in doing so, ¶¶ 2 and 13;
- Guarantor agreed absolutely and unconditionally to guaranty to Lender "ALL PRESENT AND FUTURE DEBTS" of "every type, purpose and description," including, "without limitation, all principal, accrued interest, attorney's fees and collection costs," ¶ 2 (capitalization in original);
- "Debts" includes, among other things, the Notes, Guaranty and "(extensions, renewals, refinancings and modifications of these debts), whether now existing or created or incurred in the future, due or to become due, or absolute or contingent, including obligations and duties arising from the terms of all documents prepared or submitted for the transaction such as . . . the Note," ¶¶ 1.B and 2;
- Defendant consented to all renewals, extensions, modifications and substitutions of the debt, and waived notice of and consent to future advances, ¶ 3 and 3.A;
- Guarantor is unconditionally liable under the Guaranty, regardless of whether Lender pursues any remedies against the Borrower, against any other maker, surety, guarantor or endorser of the Debt or against any Property, and Guarantor's obligation to pay according to the terms of the Guaranty shall not be affected by the illegality, invalidity or unenforceability of any notes or agreements evidencing the Debt, the violation of any applicable usury laws, forgery, or any other circumstances which make the indebtedness unenforceable against the Borrower, ¶ 4;
- Guarantor "agree[s] that this is an absolute and unconditional Guaranty," ¶ 6;
- Default on the Guaranty occurs when the Guarantor fails to make payments in full when due, fails to perform any condition or keep any promise or covenant of the Guaranty, or any default occurs under any document related to the debt, ¶ 8.A, 8.D and 8.E;
- Guarantor waives defenses of protest, presentment, demand and notice, and generally waives other defenses, ¶ 9, 9.A and 9.C;

- Guarantor represents and warrants that he is entering the Guaranty at the request of the Borrower, he is "satisfied regarding the Borrower's financial condition and existing indebtedness, authority to borrow and the use and intended use of all Debt proceeds," and that he did not rely on Lender for any information about Borrower, ¶ 12;
- Guarantor represents and warrants that he has "a direct interest in the Borrower and expect to derive substantial benefits from any loans and financial accommodations resulting in the creation of indebtedness guarantied hereby," ¶ 13;
- Lender "may rely conclusively on a continuing warranty that [Guarantor] continue[s] to be benefitted by this Guaranty and [Lender] will have no duty to inquire into or confirm the receipt of any such benefits, and this Guaranty will be effective and enforceable by [Lender] without regard to the receipt, nature or value of any such benefits," ¶ 13;
- It is assignable without notice to or consent by Guarantor, and enforceable by assignees and successors of Lender, ¶ 16; and
- Lender is permitted to obtain Guarantor's credit report from time to time, ¶ 19.

Plaintiff's Exhibit 7, pp. 1-3.

The Court now turns to the specific issues presented at trial.

## II. Did Concannon execute the Guaranty?

### A. Findings of fact

The Court first addresses admissibility of Plaintiff's Exhibit 7, the Guaranty at issue. Prior to trial, the parties stipulated that the Guaranty "was in the loan file of the original creditor, Premier Bank, and was acquired by [Radiance] in the series of transactions described [in the stipulation] and in the complaint[,]" Doc. 49, pp. 1-2, *i.e.*, the FDIC's takeover of Premier Bank, the FDIC's assignment to CADC, and CADC's assignment to Radiance. At trial, after briefly examining Concannon about the Guaranty, Radiance offered Exhibit 7. Concannon objected, arguing that the evidence was insufficient to show that Concannon had signed it, and therefore, it was not relevant. The Court conditionally admitted the exhibit, subject to final resolution of

whether the signature is Concannon's.[3] The Court now overrules Concannon's objection and admits the exhibit without condition. As discussed below, the Court finds that Concannon signed the Guaranty.

Under Fed. R. of Evid. 901(a), "the proponent of an item of evidence must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b) provides a non-exclusive list of examples of evidence that satisfy Rule 901(a)'s requirements, including "[a] comparison with an authenticated specimen by an expert witness or the trier of fact." Rule 901(b)(3).[4] The Court, as the trier of fact and pursuant to Fed. R. Evid. 901, has compared the signature on the Guaranty, which is an original, with the signatures in the record that Concannon admits are his. Without question, the Court finds that the signature on the Guaranty was placed there by Concannon. At trial, Concannon admitted that the signature on the Guaranty "look[s] like [his] signature." Concannon also admitted that the signatures on the following documents were his: Answers to First Interrogatories, Plaintiff's Exhibit 9; Concannon Affidavit, Plaintiff's Exhibit 12; Providence Farms, LLC Operating Agreement, Defendant's Exhibit 8; and Millennium Medical Services, LLC Operating Agreement, Defendant's Exhibit 10. The signatures on the Guaranty and the other documents are the same, distinctive signature. Further, Concannon has never explicitly denied that it is his signature. S*ee also U.S. v. Rhodis*, 58 Fed. Appx. 855 (2nd Cir. 2003) (Evidence, numerous documents upon

---

[3] Radiance also offered its records custodian's affidavits, Plaintiff's Exhibits 21 and 22, which the Court admitted for the purpose of establishing that the Guaranty was a business record.

[4] The Court rejects Concannon's argument that expert testimony is required to establish whether the signature on the Guaranty is his is, because Rule 901(b)(3), as discussed above, permits the trier of fact to do so. *See also Strauss v. U.S.*, 311 F.2d 926 (5th Cir. 1963) (Putting aside expert testimony of genuineness of signatures, jury was entitled to draw their own conclusion as to genuineness on various exhibits by comparison with admitted signature.).

which defendant's signature appeared, including amended tax returns, a settlement agreement, and a loan application, all of which were admitted into evidence without objection as to the authenticity of the signatures, was sufficient to support finding, in prosecution for filing false personal and corporate tax returns, that the signatures on the false tax returns belonged to defendant.); *U.S. v. Dozie*, 27 F.3d 95 (4th Cir. 1994) (Evidence of release form with claim for injuries arising out of staged accident and accompanying copy of tax return was sufficient to support defendant's convictions for attempt to defraud insurance company and his involvement in overall conspiracy; jury could compare signature on document admittedly signed by defendant with others to draw legitimate inference that defendant prepared claim documents and submitted them to insurance company.).

Next, circumstantial evidence supports the Court's finding that Concannon signed the Guaranty. Concannon admitted that he signed documents given to him by José Lindner on a regular basis. Specifically, when he first got into the Providence Farms project and went to give Lindner the first check, there were "a bunch of forms to sign," and he signed them. Plaintiff's Exhibit 11, Vol. I, pp. 70, 80. "After that, from time to time, there would be papers to sign, whether it be with Providence Farms or something else…." *Id.*

Additional circumstantial evidence consistent with Concannon signing the Guaranty is evidence of his willingness to work with Lindner, and his financial interest in Providence Farms. Concannon testified that he and Lindner had "always talked about working together on some kind of deal," and he was "looking forward to working with [Lindner] on a project." Lindner had in fact helped Concannon with Concannon's own real estate development project involving a convenience store.

Concannon also testified that he invested $600,000 in Providence Farms, making

installment payments starting in late 2007 in order to obtain what Linder told him was a tax credit and, Concannon said, "to have a little bit of equity in this thing and I would be even." Concannon also believed that he owned 50% of Providence Farms through his holding company, Millennium Medical Services, and his tax returns reflect that he claimed substantially more than $600,000 in nonpassive losses on his tax returns for the years 2007-2009. Concannon also began loaning money to José Lindner to cover what Concannon said were Lindner's obligations to make payments on Providence Farms loans. Concannon made a payment of $100,000 to Lindner in late 2008 and a second payment in February 2009, and then making a payment of $240,000 to him in September 2009, but at that time insisting on collateral from Lindner. Signing the Guaranty, which induced the bank to loan money to Providence Farms, is consistent with Concannon's interest in the project as an owner, his subsequent loans to Lindner of hundreds of thousands of dollars for it, and receipt of very substantial tax benefits from it.

The Court also rejects Concannon's suggestion that José Lindner might have forged the signature on the Guaranty. First, the evidence that the signature on the Guaranty was put there by Concannon is unusually strong. Second, Concannon offered no evidence at trial that Lindner forged the signature. Specifically, Concannon testified that he "had reason to believe that [he] did not sign" the Guaranty, but when asked if he was claiming forgery, testified, "I don't know." Concannon also admitted, in his December 2012 deposition, from a state court case brought by Midwest Bank against Providence Farms and him concerning Providence Farms' loan debts, that he was "[n]ot…aware of" any instances in which Lindner had forged his signature. Plaintiff's Exhibit 11, Vol. II, p. 10. In Concannon's eight-page, January 2013 affidavit from the Midwest Bank case, in which he described his dealings with José Lindner and Providence Farms, Concannon never asserted that Lindner had forged his signature on the Guaranty. Plaintiffs'

8

Exhibit 12. In Concannon's answers to interrogatories in the state court case brought by CADC against Providence Farms, Jay Lindner, and him, Concannon did not state that José Lindner had forged Concannon's signature on the Guaranty, only that the possibility "cannot reliably [be] rule[d] out[.]" Plaintiff's Exhibit 10.

In an attempt to support his suggestion of forgery, Concannon offered in evidence an assignment of a promissory note that he claimed José Lindner gave him and had been forged by Lindner, Defendant's Exhibit 15, but the Court sustained Radiance's objection of lack of relevance. The promissory note stated that it was given to José Lindner by American Millennium Corp., Inc., in the amount of more than $1.4 million. The final page, captioned "Consent to Assignment of Promissory Note," bears a signature above the printed name of American Millennium's vice president, *id.,* and at trial, Concannon's position was that Lindner had forged the vice president's signature. However, Concannon did not establish that he had any first-hand knowledge of a forgery. Even if he had such knowledge, however, the evidence would not show that Lindner forged the Guaranty at issue here. At most, the evidence would show a propensity to commit fraud, which is not admissible to show that Lindner acted in conformity therewith and forged the Guaranty. *See* Fed. R. Evid. 404(a)(1)("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."), and 404(b)(1)("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.*" See also Weitz Co. LLC v. Mackenzie House, LLC,* 665 F.3d 970, 974-75 (8th Cir. 2012) (evidence of prior acts, including prior lawsuits, is not admissible to prove the character of a person in order to show conformity therewith, therefore evidence concerning the defendants' other development projects was not

admissible) (citing *Harriman v. Pullman, Palace-Car Co.,* 85 F. 353 (8th Cir. 1898)); *United States v. Ngo*, 985 F.2d 576 (9th Cir. 1993) ("Neither is the evidence admissible simply because it involves the character of a third party. Rule 404 recognizes no such exception."); *United States v. Peneaux*, 81 F. Supp. 3d 764, 767 (D.S.D. 2014) (holding that courts "generally agree … that propensity evidence is … inadmissible, even if the defendant is offering the evidence against a third party").

The Court is also not persuaded by Concannon's testimony that he must have been defrauded because he never had a conversation "where [he] was asked to guarantee $20 million worth of loans that [he] did not receive"; "even the estate of José Lindner has admitted that [he, Concannon] was defrauded in this case"; and "there are other documents that José Lindner forged in relationship to Providence Farms that [Concannon] know[s] of." Whether Concannon ever had a conversation about guaranteeing loans that he "did not receive" does not mean that Concannon did not sign the Guaranty. There is no evidence in the record of any admission of fraud by the estate of José Lindner. Nor is there evidence in the record that any documents were forged by Lindner, neither the Guaranty nor any "other documents." Even if there was evidence of forgery of "other documents", such evidence would not be admissible, as discussed above. *See* Fed. R. Evid. 404(a)(1) and (b)(1); *Weitz ,* 665 F.3d at 974-75; *Ngo*, 985 F.2d 576; and *Peneaux*, 81 F. Supp. 3d at 767. The Court finds that the signature on the document was not forged.

For the above reasons, the Court finds that Concannon personally signed the Guaranty at issue.

## III. Fraud in the Factum Defense

Concannon raises the defense of fraud in the factum, which if applicable would mean the

Guaranty is void *ab initio*. Fraud in the factum, as discussed in more detail below, is a limited defense. It involves a misrepresentation intentionally or recklessly made which has been relied upon by the victim and which has caused the victim to do an act which he would not otherwise have done. Missouri courts have generally held fraud in the factum to exist in narrow circumstances.

A. **Findings of Fact**

Concannon attempts to establish his fraud in the factum defense with his testimony that he did not read documents that Lindner gave him to sign, because he had a right to rely on Lindner as his fiduciary.[5]

Concannon testified that Lindner never explained Concannon would be exposed to more than $600,000 in losses, never asked him to guaranty Providence farms' debts, and never told him that he would be guaranteeing Providence Farms debts. Concannon said that he would not have guaranteed such large loans. However, Concannon admits that he was never prevented from reading any document that Lindner gave him to sign, and that he obtained legal advice at least once, before he signed a document that Lindner gave him, the Providence Farms operating agreement, dated January 1, 2017, *i.e.,* prior to the January 24, 2008 execution of the Guaranty at issue. Plainly, Concannon read the Providence Farms operating agreement when it was presented to him and appreciated the content sufficiently well to decide to seek legal advice.

Concannon is a well-educated, practicing physician. He is also a business person, who had experience developing and marketing a software program; with his own his own real estate

---

[5] Concannon did not offer any evidence demonstrating that he had a fiduciary relationship with Lindner in the context of the Providence Farms loans and the Guaranty. Rather it appears there was none, inasmuch as Concannon and Lindner were engaged in a business venture. It was Concannon's burden to prove a fiduciary relationship if he wished to assert it in connection with his defense of fraud in the factum.

development project, a convenience store; and setting up his private practice. He wanted to work on a "deal" with Lindner, and did so. No evidence suggests he suffers from any condition that would prevent him from reading and understanding a business document, such as the Guaranty, if placed before him for signature.

The Guaranty is plainly marked "Guaranty (Continuing Debt – Unlimited)" at the top of the first page, and the words "Guaranty" or "Guarantor" appear three times immediately above the signature line on the third page. Plaintiff's Exhibit 7. The Guaranty is only three pages long. The text of the Guaranty plainly states that it covers all present and future debts of Providence Farms, and nowhere does the Guaranty reference any specific dollar amounts, such as the amount of $600,000 which Concannon had invested, or limit its terms to a specific type of debt. There is no evidence that the document was misrepresented to Concannon.

Given this evidence, it is more likely than not that Concannon knew he was signing a Guaranty when he put his signature on it. At minimum, he had ample opportunity to understand what he was signing and to seek legal advice if he wished.

The Court finds that even if Lindner failed to explain the Guaranty to him, Concannon understood what he was signing.

### B. Conclusions of law

Fraud in the factum is sometimes referred to as "fraud in the procurement", and involves a misrepresentation intentionally or recklessly made which has been relied upon by the victim and which has caused the victim to do an act which he would not otherwise have done. If fraud in the factum is shown, the contract is treated as void *ab initio*. *Wolf v St. Louis Pub. Serv. Co.,* 357 W.W. 2d 950, 957-59 (Mo. App. 1962).

Missouri courts have generally held fraud in the factum to exist in narrow circumstances,

where the misrepresentation constituting the fraud relates to the nature of the jural act performed, such as when a victim, having read an instrument presented to him, signs another, different instrument that was "fraudulently substituted by deft manipulation"; where persons who were "unable to protect their own interests by reason of illiteracy, infirmity or impairment of sight, have been deceived by fraudulent representations as to the character of the paper presented or by misreading the paper"; or where a person's "request to read an instrument just signed has been denied[.]" *Local Finance Co. v. Chariton,* 289 S.W.2d 157, 163 (Mo. App. 1956) (and citation therein). The reason that fraud in the factum is so narrowly framed is that written contracts must be afforded finality and stability, "else the door would be opened wide to confusion, perjury, and profitless litigation." *United Breeders Co. v. Wright,* 115 S.W. 470, 471 (Mo. 1909). Thus, a person is expected to avail himself of the opportunity to learn the content of what he is signing:

> That "(t)he law affords to everyone reasonable protection against fraud in dealing; but it does not go to the romantic length of giving indemnity against the consequences of indolence and folly or a careless indifference to the ordinary and accessible means of information"…is a timeless truth as compelling today…as when so graphically expressed by Chancellor Kent more than one hundred twenty-five years ago. …Our courts frequently have proclaimed that "(i)t is trite law that a person is expected to learn what an instrument contains before he signs it, either by reading or having it read, or by having its contents stated by someone on whom he has a right to rely, the circumstances considered, and provided either method of obtaining the information is available without too great inconvenience."

*Local Fin. Co. v. Charlton*, 289 S.W.2d 157, 163 (Mo. App. 1956) (and citations therein).

The facts here are not the kinds of facts which Missouri courts have found to establish fraud in the factum, relating to the jural act performed, such as when a victim, having read an instrument presented to him, signs another, different instrument that was "fraudulently substituted by deft manipulation"; where persons who were "unable to protect their own interests

13

by reason of illiteracy, infirmity or impairment of sight, have been deceived by fraudulent representations as to the character of the paper presented or by misreading the paper"; or where a person's "request to read an instrument just signed has been denied[.]" *Local Finance,* 289 S.W.2d at 163.

The facts here are that Concannon was never prevented from reading anything that José Lindner gave him to sign. Concannon once took the opportunity to have a document reviewed by his attorney before signing. Concannon is a physician and business person and there is no evidence that he has any infirmity that would prevent him from reading and understanding the Guaranty document. There is no evidence that one document was presented to Concannon, and that a different instrument, the Guaranty, was fraudulently substituted by deft manipulation for his signature.

At most, the facts are similar to those in which Missouri courts have rejected a fraud in the factum defense, and found instead fraud in the inducement, which will not prevent enforcement of a guaranty by a creditor. In *J.R. Watkins Co. v. Lankford*, 256 S.W.2d 788, 790–91 (Mo. 1953) (en banc), for example, a creditor sued principals and a surety to recover on an account for merchandise sold by the creditor to the principal. The defendant surety, Sanders, claimed that the suretyship agreement was fraudulently misrepresented to him by the principals as merely a recommendation, not a surety. The Missouri Supreme Court rejected this argument explaining:

> The rule is thus stated in Restatement of Security, Sec. 119: "Where the surety by fraud or duress of the principal has been induced to become bound to the creditor, the fraud or duress is not a defense against the creditor, if, without knowledge of the fraud, he has extended credit to the principal on the security of the surety's promise or, relying on the promise, has changed his position in respect of the principal." The following illustration is given: "P induced S to sign an instrument guaranteeing an

> extension of credit by C to P. S had an opportunity to read the instrument but did not do so and relied upon P's representation that it was a letter of recommendation. P exhibited the instrument to C, who extended the credit without knowledge of P's fraud. S is liable to C." That illustration fits this case completely. Sanders could have gone into his house, got his glasses and read the agreement before be signed it, or he could have had it read to him. There is no evidence that plaintiff had any knowledge of the alleged misrepresentations. Thus there are no facts in evidence to show that the general rule should not apply in this case.

*Id.*, 256 S.W.2d at 790–91. *See also Gen. Motors Acceptance Corp.,* 30 S.W.2d at 108 (a guarantee must "act in good faith," but "unless he has knowledge of or participates therein, he is not responsible for any misrepresentation or deception practiced by the principal, or other third person, upon the guarantor in order to induce him to enter into the contract of guaranty").

Concannon relies upon *Gate City National Bank v. Bunton,* 296 S.W. 375, 380 (Mo. 1927), to argue that "where the signer was deceived as to the character of the instrument, and signed without knowledge of it, and was himself free from negligence, he was not bound, even to an innocent holder for value." Doc. 78, p. 5. *Gate* has not been applied as broadly as Concannon argues. Twenty-six years later in *J.R. Watkins,* the Missouri Supreme Court distinguished *Gates*:

> In *Gates* **…,** the suit was on Bunton's $25,000 note made to and held by the bank. It was endorsed on the back by the two defendants who contested their liability. Each was separately asked to endorse it by Bunton. On each occasion, Bunton exhibited a $5,000 note payable to the bank signed by him; then, after the prospective endorser had read it, while obtaining the pen from the desk for his signature, Bunton substituted the $25,000 note. While being endorsed on the back, the face of the note was not visible and neither endorser looked at the note again after endorsing it. The [*Gates*] Court recognized the rule that, where one of two innocent parties must suffer by the act of a third, the one whose act enabled such third person to cause the loss must sustain it.
>
> However, the [*Gates*] Court said: "The liability, if any, of one, whose signature is obtained to a negotiable instrument in the

> manner in which defendants aver that theirs were obtained to the note in suit, arises solely from negligence, and not otherwise. If there was no negligence, there is no liability." The [*Gates*] Court held that, under the circumstances of that case, there was a jury question as to whether, in endorsing the note, the defendants were in the exercise of ordinary care. There[,] negligence as a basis for estoppel was a jury question because the endorser had read the note once and the reasonable appearances were that he was endorsing the note he had read. <u>The authorities overwhelmingly hold that is not true in a case like this where the surety did not even attempt to read the instrument at all before signing or delivering it, although there was nothing to prevent him from doing so. We, therefore, hold defendant Sanders cannot make the defense of non est factum in this case.</u>

256 S.W.2d at 791 (emphasis added). To the extent Concannon claims not to have read the Guaranty at all before signing it, although never prevented from reading any document that José Lindner gave him, the defense of fraud in factum does not lie, according to *J.R. Watkins*.

Concannon argues, nonetheless, that any negligence on his part is excused because he had the right to rely on José Lindner's representations about the documents that he gave Concannon to sign, because Lindner was Concannon's fiduciary. It is true that Missouri courts have recognized that carelessness or negligence by a signer, might be excused under some circumstances if the signer has placed his trust in another and signed a document without reading it,. *Gideon v. Teed,* 264 S.W. 70, 72 (Mo. App. 1924). In *Gideon,* a daughter induced her mother to sign a promissory note by falsely telling the daughter it was a receipt. Because the mother arguably had a right to rely on her daughter, it would be for a fact finder to determine whether the mother was guilty of negligence when she did not read the document. The court stated: "We do not think it will widen the exception [of fraud in the factum] to permit a jury to consider under all the circumstances whether the defendant was guilty of negligence." *Id. See also Rau v. Robertson,* 260 S.W. 751 (Mo. 1924).

However, as the fact finder, the Court concludes that under all the circumstances of this

case, Concannon's negligence may not be excused. First, Concannon has not shown that Lindner was acting in a fiduciary or some other equivalent relationship when he presented the Guaranty to Concannon. Second, he has not shown that José Lindner misrepresented the document.[6] Third, even if he had such evidence, Concannon has not shown that his negligence should be excused. The Court has already found that Concannon knew he was signing a Guaranty of Providence Farms' debts, even if Lindner never asked him to guaranty Providence Farms' debts, and never told him that he would be guaranteeing Providence Farms' debts. The information he says he needed from Lindner is conspicuously on the document and readily apparent to anyone who signed it. Furthermore, Concannon had, just one year prior to signing the Guaranty, read a Providence Farms operating agreement that Lindner gave him for signature and decided to take it to an attorney for review. He did not blindly sign whatever was put in front of him. Concannon is well educated and experienced in business, including real estate development. Under these circumstances, the Court finds that Concannon's negligence, if any, is not excused.

Based on this evidentiary record, the Court finds that Radiance has established, by the greater weight of the evidence, that Concannon executed the Guaranty, and that Concannon failed to establish a fraud in the factum defense.

**IV. Was the Guaranty delivered to Premier Bank on Concannon's behalf?**

    **A. Findings of fact**

The Court has found that Concannon signed the Guaranty and was aware that he was signing it. The parties stipulated that the Guaranty was in the loan file of the original creditor,

---

[6] Concannon testified that Lindner represented to Concannon that documents he was asked to sign were routine. However, Concannon has also testified that he has no memory of ever signing the Guaranty at issue here so he has no firsthand knowledge that Lindner did represent this Guaranty as routine.

Premier Bank, and that the bank relied on the Guaranty in extending credit to Providence Farms.

Concannon testified that he had no interactions with Premier Bank on or around January 24, 2008, and that the first interaction he recalls with Premier Bank personnel was at least a year later. However, Concannon admitted in a deposition that when José Lindner gave him documents to sign, he thought or assumed that Lindner was acting on his behalf, and that he paid Lindner to act on his behalf. Plaintiff's Exhibit 11, Vol. II, pp. 94-95. Concannon relied on Lindner to prepare his tax forms, draft the Millennium Medical Services operating agreement, and prepare other forms related to Providence Farms for his signature. Concannon also invested in Providence Farms and loaned money to Providence Farms based on what Lindner told him. In short, Concannon relied on José Lindner to represent him to take care of Concannon's business.

Concannon did not rebut the foregoing evidence which at a minimum makes a *prima facie* case that José Lindner delivered the Guaranty to Premier Bank on behalf of Concannon.

B.  **Conclusions of law**

The Court concludes as a matter of law that the Guaranty was delivered to Premier Bank, on behalf of Concannon by Lindner, and that Lindner had actual authority to do so.

Authority may be actual or apparent, but the burden of proving it falls on the party seeking to rely on it. *Hyken v. Travelers Ins. Co.,* 678 S.W.2d 454, 457–58 (Mo. App. 1984) (citation omitted). Actual authority is authority which the principal has conferred, either expressly or impliedly, on the agent, empowering the agent to act on the principal's behalf. *Id.* (citing Restatement (Second) of Agency § 7 (1958)). A principal can expressly confer authority by telling his agent what to do or by knowingly acquiescing to the agent's actions. *Rosenblum v. Jacks or Better of America West, Inc.,* 745 S.W.2d 754, 760 (Mo. App. 1988). Implied authority flows from express authority, and "encompasses the power to act in ways reasonably necessary

to accomplish the purpose for which express authority was granted." *Id.* The customs and the relations of the parties establish the parameters of implied actual authority. *Barton v. Snellson,* 735 S.W.2d 160, 162 n. 2 (Mo. App. 1987); *Molasky Enterprises, Inc. v. Carps, Inc.,* 615 S.W.2d 83, 87 (Mo. App. 1981); *Dudley v. Dumont,* 526 S.W.2d 839, 844 (Mo. App. 1975). Apparent authority, in contrast, is authority which the principal, by his acts or representations, has led third persons to believe has been conferred on the agent. *Hyken*, 678 S.W.2d at 457.

Concannon admitted that he signed documents José Lindner gave him to sign. He also believed or assumed that Lindner was acting on his behalf, and paid Lindner to act on his behalf. Furthermore, Lindner gave Concannon advice on financial matters; Lindner prepared Concannon's tax returns; Lindner and Concannon entered into a business deal together; and Lindner, with Concannon's knowledge and acquiescence, prepared documents including operating agreements in furtherance of their business dealings. Concannon also loaned money to Lindner to cover Providence Farms loans based on what Lindner told him. Finally, the Court has found that Concannon signed the Guaranty which under his own testimony must have been given to him by Lindner. Based on these findings, Lindner had Concannon's actual authority to deliver the Guaranty to Premier Bank, at minimum because Concannon knowingly acquiesced to Lindner's actions in representing his business and financial interests. Furthermore, Lindner's delivery of the Guaranty to the bank was well within the parameters of his implied actual authority, as established by Lindner's and Concannon's customs and relationship.

Concannon argues that Radiance failed to carry its burden to show that Premier Bank made a reasonable inquiry into the scope of Lindner's authority when he delivered the Guaranty, and that Radiance has therefore failed to demonstrate that Lindner had apparent authority, which is fatal to its claim. Because the Court has concluded that Lindner had actual authority,

Concannon's argument will not be addressed.

Based on this evidentiary record, the Court finds that Radiance has established, by the greater weight of the evidence, that Concannon signed the Guaranty, and that it was delivered to Premier Bank on Concannon's behalf by José Lindner, who had Concannon's actual authority to do so.

**V.      Conclusion**

For the reasons discussed above, the Court now enters judgment in favor of Plaintiff Radiance Capital Receivables Eighteen, LLC on its breach of Guaranty claim, in the amount of Fifteen Million Seven Hundred Sixty-Nine Thousand Seven Hundred Seventy-Four and 46/100 Dollars ($15,769,774.46) in principal; Ninety-Eight Thousand Eight Hundred Sixty-Four and 35/100 Dollars ($98,864.35) in interest accrued in the *per diem* amount of Four Thousand Two Hundred Ninety-Eight Dollars and 45/100 ($4,298.45) from September 1, 2014, through September 23, 2014; as of October 2, 2017, Six Million Four Hundred Thirteen Thousand Five Hundred Eighty Five and 15/100 Dollars ($6,413,585.15) in post-Consent Judgment interest is due and owing (the *per diem* amount of $5,804.15 since September 24, 2014 (1,105 days)), plus the costs of collection.

The Court finds against Defendant Concannon on his defense of fraud in the factum. The Court finds against Plaintiff on its alternative claim, Count II, quantum meruit.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:  October 10, 2017  
Jefferson City, Missouri